Donald L. McLEOD, an individual, for and on behalf of all persons owning property within Columbia County subject to the, challenged tax; R.E. Watkins, Jr., an individual, for and on behalf of all persons owning property within Columbia County subject to the challenged tax; Charles E. McLeod, an individual, for and on behalf of all persons owning property within Columbia County subject to the challenged tax; George Fuller, Jr., an individual for and on behalf of all persons owning property within Columbia County subject to the challenged tax, Plaintiffs,

v.

COLUMBIA COUNTY, GEORGIA, through the chair of Columbia County Board of Commissioners, Barry A. Fleming, Defendants.

No. CV 101–122.

United States District Court,
S.D. Georgia,
Augusta Division.

March 31, 2003.

John Paul Batson, John B. Long, Tucker, Everitt, Long, Brewton & Lanier, PC, Augusta, GA, for plaintiffs.

James B. Ellington and Patrick J. Rice, Hull, Towill, Norman, Barrett & Salley, PC, Augusta, GA, for Defendant.

## ORDER

BOWEN, District Judge.

On June 27, 2002, the United States Court of Appeals for the Eleventh Circuit declined to determine whether the Tax Injunction Act ("TIA"), 28 U.S.C.A. § 1341 (1993), divested this Court of jurisdiction to hear this case. (Doc. No. 45.) Fully aware of its duty to assure subject matter jurisdiction before disposing of a case on its merits, *see Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir.2001),[1] this Court has undertaken to re-examine the effect of the TIA in this case. After a thorough review of the record, the Court now **FINDS** that it lacks subject matter jurisdiction to adjudicate this case. As a result, this case shall be **REMANDED** to the Superior Court of Columbia County, Georgia.

## I. *BACKGROUND*

### A. Procedural History

Defendants removed this case from the Superior Court of Columbia County. In timely fashion, Plaintiffs filed a motion for remand. (Doc. No. 7.) The Court denied the motion (Doc. No. 12), which prompted Plaintiffs to request that the Court reconsider its decision. (Doc. No. 15.) The Court again refused to remand the case to Superior Court (Doc. No. at 4), but noted for the first time that "[a]lthough the face of the Complaint allows for removal, the Tax Injunction Act, 28 U.S.C. § 1341, may ultimately strip this Court of its subject matter jurisdiction." (Doc. No. 16 at 3.) The Court then ordered the parties to submit briefs on the effect of the TIA. (*Id.* at 3–4.)

Plaintiffs subsequently submitted their brief and then filed a motion requesting that the Court stay any ruling on the merits of the case until such time as the procedural posture of the litigation could be determined. (Doc. No. 20 at 5.) The

---

1. "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises." *Smith,* 236 F.3d at 1299.

Court denied Plaintiffs' motion (Doc. No. 21) and stated within its Order that the Columbia County ordinance appeared to more closely resemble a fee than a tax (Doc. No. 21 at 4), but that "[t]he issue of whether this Court has subject matter jurisdiction under the Tax Injunction Act involves a controlling question of law as to which there is substantial ground for difference of opinion...." (Doc. No. 37 at 6.)[2] As a result, the Court allowed Plaintiffs to proceed with an interlocutory appeal and the case closed for statistical purposes. (Doc. No. 38.) Despite the uncertainty of the Court's jurisdiction, the Eleventh Circuit declined to answer the question of whether the TIA required a remand of this litigation to the Superior Court of Columbia County, and on June 27, 2002, the Court of Appeals denied the petition for permission to appeal. (Doc. No. 45 at 1.) As a result, this case was reopened on August 6, 2002. (Doc. No. 47 at 1.)

### B. The Storm Water Ordinance

#### 1. Promulgation of the Storm Water Ordinance

On March 2, 1999, the Board of Commissioners of Columbia County, Georgia ("the Board") adopted a "storm water ordinance,"[3] which became effective on April 1, 1999. As originally passed, the storm water ordinance was contained in sections 2–6.1–30 to –38 of the Code of the Ordinances of Columbia County.[4] On August 15, 2000, the Board amended various existing sections of the storm water ordinance and added sections 2–6.1–39 to –43. *See* Columbia County, Ga. Ordinance No. 00–6. Approximately two months later, the Board again amended the storm water ordinance, altering sections 2–6.1–32, –36, and –38. *See* Columbia County, Ga. Ordinance No. 00–11.

#### 2. Purpose and Findings of the Board

The Board passed the storm water ordinance after receiving the report of a consultant who performed professional engineering and financial analyses of the County's storm water management needs. Code of Ordinances § 2–6.1–30(a).[5] The consultant's report indicated that additional storm water management services, systems and facilities were desirable in the more developed portions of the unincorporated area of Columbia County. *See id.*[6] As a result, the Board passed the storm water ordinance, which provided for the following three items: (1) a utility, known as the Columbia County Stormwater Utility ("CCSU"), to be responsible for storm water management services, systems and facilities, *id.* § 2–6.1–31(a); (2) the establishment of an accounting unit known as

---

**2.** The quoted language was added to the Court's Order by amendment. Satisfied that a significant dispute still existed concerning the jurisdiction of this Court to hear the case, Plaintiffs filed a motion asking the Court to amend its Order (Doc. No. 21) to allow them to seek an interlocutory appeal pursuant to 28 U.S.C.A. § 1292(b) (1993). (Doc. No. 22 at 2.) The Court granted Plaintiffs' motion, stating that although it initially believed that the TIA did not apply to the storm water utility charge, it found the question debatable. (Doc. No. 37 at 4.) As a result, the original Order (Doc. No. 21) was amended to include the quoted language.

**3.** For the sake of simplicity and clarity, the Court will refer to the numerous relevant provisions of Chapter 2–6.1, Article II of the Code of Ordinances of Columbia County with the singular designation "storm water ordinance."

**4.** Defendants supplied a copy of the relevant portions of the Columbia County Code in their brief on the Tax Injunction Act. (Doc. No. 18 Ex. A.)

**5.** The Court will refer to the Code of Ordinances of Columbia County, Georgia as the "Code of Ordinances". In addition, the sections cited by the Court are those as they exist following the Board's amendments in ordinances 00–6 and 00–11.

**6.** "The Board of Commissioners finds and concludes from the professional engineering and financial analyses that it would be desirable to provide for additional Stormwater Management Services and Stormwater Management Systems and Facilities within certain more developed portions of the unincorporated area of Columbia County."

the "Enterprise Fund" for the management of all funding applicable to the purposes and responsibilities of the CCSU, *id.* §§ 2–6.1–31(b), –30(b)(2); and (3) a storm water utility service charge based, in part, on the areas of impervious surface located on a property, *id.* §§ 2–6.1–35(a), –30(b)(9), –36.

The Board also made the following specific findings regarding the storm water ordinance:

> The stormwater needs in Columbia County include but are not limited to protecting the public health, safety, and welfare. Provision of stormwater management services and stormwater management systems and facilities and regulation of the use therefore renders and/or results in both service and benefit to individual properties, property owners, citizens, and residents of Columbia County and to all properties, property owners, citizens, and residents of the county concurrently in a variety of ways as identified in the professional engineering and financial analyses.

*Id.* § 2–6.1–30(b)(5).

*3. The Storm Water Service Charge*

Prior to the passage of the storm water ordinance in 1999, Columbia County already owned and operated storm water systems and facilities, *id.* § 2–6.1–30(b)(7), which were apparently maintained, at least in part, through general revenue, *id.* § 2–6.1–30(b)(4).[7] Based upon the Board's conclusion that the more developed portion of the unincorporated area of the county needed improved storm water services, systems and facilities, the Board determined to provide for these needs through the storm water charge. *Id.* § 2–6.1–30(b)(8), –36. The funds collected from the service charges were to be placed in the Enterprise Fund and dedicated solely to the expenses and capital investments of the CCSU. *Id.* § 2–6.1–30(b)(2), (b)(12).[8] However, because the entire county needed a threshold level[9] of storm water services, systems and facilities, "all of the unincorporated area of Columbia County [was to] continue to be funded from the county's general tax revenues...." *Id.* § 2–6.1–30(b)(4). Thus, the Board further deemed that the storm water utility fund was to be reimbursed from the County's general tax revenues to the extent there were any expenditures for the provision of a threshold level of service. *Id.*

The Board concluded that a rate based, in large measure, on the amount of impervious surface[10] located on an owner's prop-

---

7. Section 2–6.1–30(b) states that "[i]t is equitable that the threshold level of such services, systems and facilities in all of the unincorporated area of Columbia County *continue* to be funded from the county's general tax revenues," thereby indicating that prior to the creation of the storm water charge these services were being provided through general tax revenue. Code of Ordinances § 2–6.1–30(b)(4) (emphasis added).

8. Section 2–6.1–35 states that "[t]he cost of stormwater management services and stormwater management systems and facilities may include operating expenses, capital invest-

ment, and reserve accounts." Code of Ordinances § 2–6.1–35(b).

9. The term "threshold level" is defined as follows: "Threshold level when used in reference to stormwater management services or stormwater management systems and facilities shall mean a system of open ditches and culverts located where needed within road rights-of-way and the maintenance of same to keep them open and free flowing." Code of Ordinances § 2–6.1–32.

10. "Impervious Surface" is defined as follows:

erty would be the most appropriate means of determining the charge. *Id.* § 2–6.1–30(b)(9). According to the Board, the most important factor influencing the cost of storm water management is the amount of impervious surface on a property. *Id.* § 2–6.1–30(b)(11). Thus, determining a property owner's service charge based on the amount of impervious surface on his property satisfied the Board's requirement that similarly situated properties be assessed the same charge. *Id.* § 2–6.1–35(a).

The Board determined that "[t]he Stormwater Service Charge rate for each Equivalent Run Off Unit shall be Eight and Seventy Five One Hundred Cents ($0.0875)." *Id.* § 2–6.1–36(c).[11] The Board defined an "Equivalent Run Off Unit" ("ERU") to mean 100 square feet, or any portion thereof, of impervious surface on a property. *Id.* § 2–6.1–32.

Because some developed lands would cause fewer problems than others, the Board created credits against the charge "based on attaining and continuing compliance with the technical requirements and performance standards contained in the Stormwater Service Charge Credit Technical Manual." *Id.* § 2–6.1–37(f), (g). The Board also provided exemptions from the charges for certain properties, including those outside the service area of Columbia County. *Id.* § 2–6.1–37(b)(e). The service

charges began to accrue October 1, 2000 and are billed on a monthly basis. *Id.* § 2–6.1–38. These charges "shall be set and may be modified from time to time by the Board of Commissioners." *Id.* § 2–6.1–36.

## II. DISCUSSION

The singular issue before the Court is whether the storm water utility charge is a tax or a fee for purposes of the TIA. If the charge is a tax, the Court lacks jurisdiction to adjudicate the merits of the case. Thus, the Court addresses this threshold issue.

### A. The TIA

The TIA, passed in 1937, provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C.A. § 1341; *see also Miami Herald Pub. Co. v. City of Hallandale,* 734 F.2d 666, 670 (11th Cir.1984). The restriction imposed by the TIA on federal courts is jurisdictional, *Colonial Pipeline Co. v. Collins,* 921 F.2d 1237, 1242 (11th Cir. 1991), and intended "to be a broad ... impediment to federal court interference with the administration of state tax systems," *United Gas Pipe Line Co. v. Whitman,* 595 F.2d 323, 326 (5th Cir.1979).[12] Indeed, the Act is intended to further "a

Impervious Surfaces are those areas which prevent or impede the infiltration of stormwater into the soil in the manner in which it entered the soil in natural conditions prior to development. Common Impervious Surfaces include, but are not limited to, rooftops, sidewalks, walkways, patio areas, driveways, parking lots, storage areas, compacted gravel and soil surfaces, awnings and other fabric or plastic coverings, and other surfaces which prevent or impede the natural infiltration of stormwater runoff which existed prior to development.
Code of Ordinances § 2–6.1–32.

11. The number given in parentheses was apparently a mistake. Rather, the figure should have been "$8.75." The $8.75 figure corresponds with that given on Columbia County's Web site. *See* http://www.co.columbia.ga.us/engineering—environmental/ Stormwater/stormwaterfaq.html

12. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

general federal policy of noninterference with state taxing procedures." *Miami Herald*, 734 F.2d at 670. However, the TIA only applies to situations involving a "tax under state law".[13]

Federal law determines what constitutes a tax under the TIA. *Trailer Marine Transp. Corp. v. Vazquez*, 977 F.2d 1, 5 (1st Cir.1992); *Butler v. State of Maine*, 767 F.Supp. 17, 19 (D.Me.1991). However, "[s]tate law determinations as to whether a fee is a tax may still be pertinent or instructive." *Diginet, Inc. v. Western Union ATS, Inc.*, 845 F.Supp. 1237, 1240 (N.D.Ill.1994).

The Eleventh Circuit has noted that the concept of a "tax under state law", as expressed in the TIA, is broad: "In light of the Act's overarching purpose to impede federal court interference with state tax systems, Section 1341 has been construed to be much broader than its words initially suggest." *Miami Herald*, 734 F.2d at 670 (internal quotation marks omitted). The preeminent test determining what constitutes a "tax" under the TIA is *San Juan Cellular Telephone Company v. Public Service Commission of Puerto Rico*, 967 F.2d 683 (1st Cir.1992), authored by then-chief judge, now justice, Breyer. The *San Juan Cellular* case has been cited by many federal appellate courts.[14]

## B. The Three Factor Test of *San Juan Cellular*

The Court in *San Juan Cellular* set forth three questions that help distinguish a "tax" from a "fee": (1) What entity imposed the fee? (2) What parties are being assessed the fee? (3) Is the revenue generated by the fee expended for general public purposes or used for the regulation and benefit of the parties upon whom the assessment is imposed? *San Juan Cellular*, 967 F.2d at 685; *Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996). The *San Juan Cellular* court explained that "[t]he classic 'tax' is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community. The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation." *San Juan Cellular*, 967 F.2d at 685 (citations omitted). Analysis of the storm water charge under the three-factor test indicates it is a "tax" for purposes of the TIA rather than a fee.

### 1. Who Imposed the Charge?

If a legislative body sets the rate of a charge and obligates a party to pay, then that entity is generally considered to be the one that imposed the charge. *See Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir.2000) (finding that a solid waste fee created by the West Virginia legislature was thus "imposed by the

---

**13.** It is noteworthy that the TIA would not bar this Court's jurisdiction if the state courts did not provide a "plain, speedy or effective remedy." However, neither party has asserted or argued that the Georgia courts cannot provide such a remedy. Rather, the parties have focused on whether the storm water charge is a fee or a tax; thus, this Court's inquiry is confined to that question.

**14.** *See, e.g., Cumberland Farms, Inc. v. Tax Assessor*, 116 F.3d 943, 946 (1st Cir.1997); *Collins Holding Corp. v. Jasper County*, 123

F.3d 797, 800 (4th Cir.1997); *Neinast v. State of Texas*, 217 F.3d 275, 278 (5th Cir.2000); *Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist.*, 166 F.3d 835, 837–38 (6th Cir.1999); *Hager v. City of West Peoria*, 84 F.3d 865, 870, 871 (7th Cir.1996); *Chicago and North Western Transp. Co. v. Webster County Bd. of Sup'rs*, 71 F.3d 265, 267 (8th Cir.1995); *Hexom v. Or. Dep't of Transp.*, 177 F.3d 1134, 1136 (9th Cir.1999); *Marcus v. Kansas Dep't of Revenue*, 170 F.3d 1305, 1311 (10th Cir.1999).

West Virginia legislature"); *Bidart Bros.*, 73 F.3d at 931; *San Juan Cellular Tel. Co.*, 967 F.2d at 686 (finding that the Puerto Rico Public Service Commission, a regulatory agency, imposed a charge because it could determine the periodic rate and prescribe the manner and time that the payments could be made). Though Defendants contend that the CCSU imposed the fee (Doc. No. 18 at 12), a fair reading of the ordinance demonstrates otherwise. Several sections of the ordinance evidence that the Board created the fee. First, the Board determined that the basis for calculating the user fee would be the amount of impervious surface on a property, *id.* § 2-6.1–30(b)(11), and that the basic unit of impervious surface should be the ERU, defined as 100 square feet of impervious surface, *id.* § 2-6.1–32. Second, the Board determined the amount of money that would be charged for each ERU ($8.75). *Id.* § 2–6.1–36(c). Finally, the Board retains the power to set and modify the storm water charge. *Id.* § 2–6.1–36. Thus, the provisions of the storm water ordinance demonstrate that the Board imposed the storm water charge, not the CCSU.

### 2. Who Is Assessed the Fee?

The *San Juan Cellular* court stated that a classic tax "is imposed by a legislature *upon many, or all, citizens.*" *San Juan Cellular*, 967 F.2d at 685 (emphasis added). Thus, an "assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Bidart Bros.*, 73 F.3d at 931.

The class of people paying the storm water charge are those property owners in Columbia County possessing property in the service area that contains impervious surface. Defendants have filed a stipulation that as of September 6, 2002, a total of 24,354 accounts were assessed the storm water charge, which, because of the large number of personal residences in the service area, covers a multitude of Columbia County's citizens. (Doc. No. 49.) The class includes a wide variety of property owners ranging from homeowners to business owners who possess property covered with a minimum of impervious surface.[15] Indeed, the ordinance covers properties containing detached single-family homes, duplexes, apartment houses, condominiums, townhomes, boarding houses, motels, hotels, storage facilities, parking lots, public and private schools, hospitals, airports, commercial and office buildings, or any other land that might have a minimum of impervious surface. Code of Ordinances § 2-6.1-32. In fact, the "Official Map of Columbia County Stormwater Utility Service Area" ("the Service Area Map") indicates that much of the developed part of Columbia County falls within the service area, including Evans, Georgia and Martinez, Georgia.[16][17]

It is noteworthy that Columbia County's development is atypical of many counties. Though Columbia County has two incorporated municipalities within its border, over 90% of the population is in the unincorporated area of the county.[18] The city of Harlem, with a population of 6,089, and the city of Grovetown, with a population of

---

15. The ordinance covers "developed land" which is defined as "property altered from its natural state by construction or installation of more than 200 square feet of Impervious Services." Code of Ordinances § 2–6.1–32.

16. The Service Area Map was supplied by Defendants. (Doc. No. 18 Ex. B.)

17. Neither Evans, Georgia nor Martinez, Georgia are incorporated, despite the large amount of development in those areas.

18. The Court's population figures are based on the most recent 2000 census information. *See* http://www.gadat a.org/Information—Services/2000citybycounty.htm.

1,814, comprise only 7,903 people in a county with a population of 89,288. Therefore, the bulk of the population, 81,385 people, live in the unincorporated area.

Of the 81,385 people in the unincorporated area of the county, the overwhelming majority of them live in the service area. In fact, 66,137 people live within the boundaries of the Service Area.[19] Thus, over 80% of the population within the unincorporated area of the county lives in the service area; the population of the service area further represents almost 75% of the county's total population. The result, therefore, is that the ordinance covers a wide variety of property owners and much of Columbia County's population.

### 3. Whom Does the Revenue Benefit?

Columbia County has indicated that the impetus behind the storm water charge was the extraordinary growth of the population within the southeastern portion of the county. (Doc. No. 18 at 3.[20]) As a result of this speedy development, the Board had to seek funding to manage the runoff created by the increased amount of impervious surface. (Id. at 3.[21]) Thus, the Board created the storm water charge.

Defendants contend that the placement of the funds from the storm water charge into an account segregated from the county's general revenue demonstrates the storm water charge is a fee and not a tax. (Id. at 15.) Defendants further state that the storm water charge is a service charge tied to a property owner's specific use of the storm water management service. As Defendants explain, a property owner pays a fee related to the amount of impervious surface on his property. The more impervious surface on a piece of property, the more the owner of that property burdens the storm water management system with runoff and, thus, the more that owner should pay. (Id. at 4, 15.)

Initially, the Court notes that "the fact that revenue is placed in a special fund is not enough reason on its own to warrant characterizing a charge as a 'fee.' If the revenue of the special fund is used to benefit the population at large then the segregation of the revenue to a special fund is immaterial." *Valero Terrestrial Corp.*, 205 F.3d at 135 (citation omitted); *see also Bidart Bros.*, 73 F.3d at 932, ("[E]ven assessments that are segregated from general revenues are 'taxes' under the TIA if expended to provide a general benefit to the public.") (internal quotation marks omitted). Indeed Defendants' arguments are unavailing because (1) the management of storm water in the county is (and was) financed, at least in part, by general tax revenues and (2) the real beneficiaries of the storm water fees are the public at large. As the *San Juan Cellular* court emphasized, close cases are often decided by "asking whether [the use of the disputed revenue] provides a *general benefit to the public*, of a sort *often financed by*

---

19. The Court has once again called upon the capable services of Linda Meggers, Director of Reapportionment Services for the Georgia General Assembly. *See Johnson v. Miller*, 864 F.Supp. 1354, 1361 (S.D.Ga.1994) (singling out Ms. Meggers as "probably the single most knowledgeable person available on the subject of Georgia redistricting"), *aff'd*, 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995). Utilizing geographic data on "Hershel," her computer, Ms. Meggers was able to determine the number of citizens within the service area.

20. "Stormwater management and regulation have rapidly become one of the biggest problems resulting from the extremely rapid growth experienced in the southeastern portion of the County in recent years."

21. "Because of the denser level of development in some portions of the County, the natural hydrology of these developed areas has been altered in a greater degree, and these areas of the County require a higher level of stormwater management services, systems and facilities."

*a general tax,* or whether it provides more narrow benefits to regulated companies or defrays [an] agency's costs of regulation." *San Juan Cellular,* 967 F.2d at 685 (emphasis added).

Storm water management was and is the type of service that is often funded through general tax revenue. *See Fulton County Taxpayers Association v. City of Atlanta,* No.1999CV05897, 1999 WL 1102795 (Ga.Super.Ct. Sept. 22, 1999). First, prior to the passage of the storm water ordinance in 1999, Columbia County already owned and operated storm water systems and facilities, which were apparently maintained using general revenue. Code of Ordinances § 2–6.1–30(b)(4). Second, all of the threshold storm water management services throughout the county (including the service area) are still funded from the county's general tax revenue. *Id.* In fact, the Board deemed that the storm water utility fund was to be reimbursed from the county's general tax revenue to the extent there were any expenditures from that fund for the provision of a threshold level of service. *Id.* As a result, the current and prior financing of storm water management indicate that it is the type of governmental service that is provided by general revenue.

The Board also acknowledges that every member of the public benefits from storm water management. *See id.* § 2–6.1–30(b)(5). Storm water systems help prevent erosion, collect contaminated water for cleansing, keep roadways from flooding, and prevent the formation of standing pools of stagnant water. The benefits resulting from this management are shared by nearly every member of the public, as the Board's findings indicate.

The overwhelming majority of Columbia County's citizens live in the service area. Thus, most of the business development in the county lies within the service area. The result, therefore, is that the economic and residential hub of the county is covered by the charge. Because Columbia County's citizens work, shop, and travel in the service area, storm water management benefits nearly everyone in the county.[22]

*4. Result*

The *San Juan Cellular* test indicates that the storm water charge is a "tax" for purpose of the TIA. The charge was (1) imposed by the Board, not the CCSU, (2) upon many citizens of Columbia County who own a wide variety of properties, and it (3) has resulted in a benefit to the general public. Further, storm water management services were funded by general tax revenue prior to the imposition of the storm water charge, and a threshold level of service is still paid for by general tax revenue.

One court in Georgia has addressed a case similar to this one. In *Fulton County*

---

**22.** Columbia County's Web site also gives some indication of the extent to which the general public will benefit from the expenditure of the proceeds from the storm water charge. The Web site contains answers to frequently asked questions, one of which is the following:

> **What will the money [from the storm water charge] be spent on?**
> - Initiate greenspace initiatives along stream banks in developing areas of the County
> - Promote flood plain management and pollution prevention programs
> - Utilize computer modeling techniques to analyze and project stormwater runoff impacts
> - Construct Reed Creek Diversion Canal, Stevens Creek Road, and Blue Ridge Drive projects to reduce stormwater runoff problems
> - Perform watershed assessments to monitor chemical and biological health of streams and implement corrective measures, if necessary.
>
> http://www.co.columbia.ga.us/engineering—environmental/ Stormwater/stormwater-faq.html

*Taxpayers Association v. City of Atlanta*, No.1999CV05897, 1999 WL 1102795 (Ga.Super.Ct. Sept. 22, 1999), the City of Atlanta passed a storm water ordinance that created a storm water utility to be responsible for controlling runoff. *Fulton County Taxpayers*, 1999 WL 1102795, at *1. The city assessed each property owner a fee based on the size of the property. *Id.* The Georgia court was forced to determine whether this charge was a tax:

> [T]he "fee" does not in actuality regulate anything no[r] does it relate directly to a benefit received, and ... this charge appears to be imposed to help the City raise revenue for public purposes.... Here the City has effectively taken an item which was once paid for by the general fund and recharacterized it as a separate and distinct "fee" without a corresponding decrease in taxes. The City has done so without the protections afforded for taxpayers through the taxing and budgetary processes provided in the Constitution and without the public scrutiny which surrounds the budgetary process and property tax increases. The Court can easily envision a day when the City would take other core governmental functions, such as police and fire protection, and assess each landowner a "fee" for this "service" rendered. A tax is a tax, regardless of the innocuous, euphemistic title applied to it by the City.

*Id.* at *4. The Georgia court's determination that a similar fee was a tax is persuasive and comports with this Court's determination. As a result, the TIA divests this Court of jurisdiction.

## III. CONCLUSION

After a review of the record, the Court now **FINDS** that it lacks subject matter jurisdiction to adjudicate this case. As a result, this case shall be **REMANDED** to the Superior Court of Columbia County, Georgia. The pending motions (Doc. Nos.28, 48, 50, 51) are **DEFERRED** for resolution by the Superior Court.[23] Each party shall bear its own cost necessitated by removal.

**ORDER ENTERED** at Augusta, Georgia this 31st day of March, 2003.

23. Though the Court has labored some time in determining whether the storm water charge is a tax, Plaintiffs did not provide the Court any demographic information and very little detailed analysis of the storm water ordinance. In fact, the Court brought the TIA to the parties' attention before requesting they submit briefs on it. Consequently, the research necessary to obtain important information about Columbia County and the storm water ordinance has been undertaken by the Court.