**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1060**

NORFOLK SOUTHERN RAILWAY COMPANY,

Plaintiff − Appellant,

v.

CITY OF ROANOKE, a Virginia Municipality,

Defendant – Appellee,

and

CHESAPEAKE BAY FOUNDATION,

Intervenor/Defendant − Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Glen E. Conrad, District Judge.  (7:16-cv-00176-GEC)

Argued:  November 1, 2018                    Decided:  February 15, 2019

Before WILKINSON, WYNN, and DIAZ, Circuit Judges.

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Wynn joined.  Judge Wilkinson and Judge Wynn wrote separate concurring opinions.

**ARGUED:**  Gary A. Bryant, WILLCOX & SAVAGE, P.C., Norfolk, Virginia, for Appellant.  Monica Taylor Monday, GENTRY LOCKE, Roanoke, Virginia; Jon Alan

Mueller, CHESAPEAKE BAY FOUNDATION, Annapolis, Maryland, for Appellees. **ON BRIEF:** Gregory J. Haley, Scott A. Stephenson, GENTRY LOCKE, Roanoke, Virginia; Daniel J. Callaghan, OFFICE OF THE CITY ATTORNEY FOR THE CITY OF ROANOKE, Roanoke, Virginia, for Appellee City of Roanoke. Alayna Chuney, Brittany Wright, CHESAPEAKE BAY FOUNDATION, INC., Annapolis, Maryland, for Appellee Chesapeake Bay Foundation, Inc.

---

DIAZ, Circuit Judge:

Plaintiff Norfolk Southern Railway appeals the district court's order granting summary judgment for Defendant City of Roanoke, Virginia and Defendant-Intervenor Chesapeake Bay Foundation in this lawsuit alleging discriminatory taxation in violation of the Railroad Revitalization and Regulatory Reform Act of 1976. The district court concluded that the City's stormwater management charge is a fee, rather than a tax. This distinction matters because only taxes are subject to challenge under the Act. For the reasons that follow, we affirm.

I.

A.

The City of Roanoke operates a stormwater management system that includes gutters, storm drains, channels, retention basins, and other infrastructure. The system collects stormwater and diverts it into the Roanoke River or one of its thirteen tributaries in the City.

To operate its system, the City must hold a permit issued by Virginia's Department of Environmental Quality pursuant to the federal Clean Water Act and Environmental Protection Agency regulations. Such permits "require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for the control of such pollutants." 33 U.S.C. § 1342(p)(3)(B)(iii). The City's permit requires it to implement

six "minimum control measures" and meet Total Maximum Daily Load ("TMDL") limits, among other requirements.[1]

To facilitate compliance with applicable state and federal stormwater regulations, Virginia law authorizes municipalities to establish stormwater utilities and enact stormwater management charges. Va. Code Ann. § 15.2.2114. These charges must be enacted "by ordinance," and must "be based upon an analysis that demonstrates the rational relationship between the amount charged and the services provided." *Id.* § 15.2.2144(A), (B). Localities must also provide for full or partial waivers of charges to property owners who engage in certain stormwater management practices. *Id.* § 15.2-2114(D). Income from the charges "shall be dedicated special revenue . . . and may be used only to pay or recover costs for" seven purposes related to stormwater management. *Id.* § 15.2-2114(A).

In 2013, the Roanoke City Council enacted an ordinance establishing a Stormwater Management Utility and a stormwater utility charge. The City Council found that "an adequate, sustainable source of revenue for stormwater management activities is necessary to protect the general health, safety, and welfare of the residents of the city." Roanoke, Va., Code § 11.5-2. The Council also found that "parcels . . . with higher amounts of impervious surfaces contribute greater amounts of stormwater and pollutants

---

[1] Minimum control measures include various means of reducing pollutants to comply with the Clean Water Act, from public outreach and participation to system operation and maintenance. EPA, National Pollutant Discharge Elimination System— Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges, 64 Fed. Reg. 68,722, 68,752 (Dec. 8, 1999). TMDLs limit total discharges of specified pollutants based on water quality criteria. 33 U.S.C. § 1313(d).

to the city's stormwater management system and that the owners of such parcels should carry a proportionate burden of the cost of such system." *Id.* Therefore, the Council chose to base the charge on "a parcel's impervious surface cover." *Id.*

The ordinance imposes the stormwater management charge on all "improved parcels," *id.* § 11.5-3(a), meaning all parcels with 250 square feet or more of impervious surface, *id.* § 11.5-10(e). An impervious surface is one that significantly impedes or prevents "the natural infiltration of water into the soil." *Id.* § 11.5-10(d). Approximately 86% of the parcels in the City are considered improved parcels subject to the charge. J.A. 57.

Owners of improved parcels may apply for credits against the charge imposed upon them. Roanoke, Va., Code § 11.5-7. Credits are available for various stormwater management activities that reduce, control, or treat stormwater runoff from improved parcels, such as installing rain gardens or pervious asphalt. *Id.*; *see* J.A. 135–36. The maximum credit allowed for a given parcel is 50% of the total charge. *Id.* § 11.5-7(b)(1).

All revenue from the charge is deposited into a stormwater utility enterprise fund, which is separate from the City's general fund. The enterprise fund may only be used for six stormwater management-related purposes listed in Va. Code Ann. § 15.2-2114(A). Since it was established, the Utility has used all revenue from the charge for stormwater management.

## B.

Norfolk Southern is one of the City's largest property owners, and it holds one of the City's largest improved parcels. In 2017, it was assessed a stormwater charge of

5

$416,748.28 for that parcel. Much of Norfolk Southern's property is covered by railroad track and ballast. Ballast is the crushed stone surface beneath railroad tracks that stabilizes the tracks and drains stormwater away from them.

Norfolk Southern claims that its ballasted property should be exempt from the charge. It contends that ballast is at least as pervious to stormwater runoff as lawns, which are not considered impervious surfaces and are not subject to the charge.

## C.

Following unsuccessful attempts to exempt the ballasted property from the charge, Norfolk Southern sued the City, alleging that the stormwater management charge is a discriminatory tax in violation of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), 49 U.S.C. § 11501. Under the 4-R Act, states and localities may not impose any "tax that discriminates against a rail carrier." *Id.* § 11501(b)(4). Norfolk Southern alleges that the City's stormwater management charge does just that because it treats ballasted property differently from lawns, even though the two are, in the railroad's view, equally pervious to stormwater.

Following a period of discovery, the district court granted Defendants' motion for summary judgment, concluding that although it is "admittedly a close question," the charge is not subject to the 4-R Act's requirements because it is a fee rather than a tax. *Norfolk S. Railway Co. v. City of Roanoke*, No. 7:16 CV 00176, 2017 WL 6599008, at *8–9 (W.D. Va. Dec. 26, 2017). We review the district court's decision de novo. *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 133 (4th Cir. 2000).

6

II.

Because the 4-R Act applies only to taxes, not fees, we must determine whether the charge in this case is closer to (1) a paradigmatic tax, which "is imposed by a legislature upon many, or all, citizens" and "raises money, contributed to a general fund, and spent for the benefit of the entire community," or (2) a paradigmatic regulatory fee, which "is imposed by an agency upon those subject to its regulation," and serves regulatory purposes by disincentivizing conduct or raising money to defray regulatory expenses. *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992). In answering this question, we are aided by the three-part framework suggested in *San Juan Cellular* and adopted by this court in *Valero*, 205 F.3d at 134.[2] This framework focuses on "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." *Id.* If the charge falls "somewhere in the middle" between a classic tax and a classic fee, the most important of these considerations is the charge's purpose. *Id.*

---

[2] Defendants urge us not to apply the *San Juan Cellular* framework to this 4-R Act case because it was developed in cases that concerned different statutes. Nothing about the framework, however, is statute-specific. As Judge Wynn aptly notes in his concurring opinion, it merely provides flexible and versatile guidance in assessing where a particular charge sits on the tax-fee continuum. Indeed, *San Juan Cellular* aimed to synthesize the general approach that courts had taken to distinguish taxes from fees "in a variety of statutory contexts." 967 F.2d at 685.

## A.

We first consider who sets the charge. A charge is more likely to be a tax if it's imposed by the legislature, rather than an administrative agency. *Valero*, 205 F.3d at 134. Here, this factor suggests that the charge is a tax because it's imposed by Roanoke's legislative body, the City Council.[3]

## B.

Under the second *San Juan Cellular* factor, a charge is more likely to be a tax if it is imposed on a broad segment of the public. *GenOn Mid-Atl., LLC v. Montgomery County*, 650 F.3d 1021, 1024 (4th Cir. 2011). And assessment of a tax is often based "solely on ability to pay," as measured by a payor's property or income, rather than tied to the receipt of a particular benefit or the imposition of a regulatory burden. *Nat'l Cable Television Ass'n, Inc v. United States*, 415 U.S. 336, 341 (1974); *see DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 126 n.3 (4th Cir. 2008) (discussing the significance of whether an assessment is tied to income). By contrast, the classic fee is imposed only upon persons subject to regulation by a particular agency. *Valero*, 205 F.3d at 134.

---

[3] As Defendants point out, the Virginia statute authorizing the charge requires that it be passed through ordinance by the City Council. This makes the Council somewhat less like an autonomous legislature and somewhat more like an administrative agency implementing the state statute, which itself forms a part of the Clean Water Act's comprehensive regulatory scheme. But the authorizing statute still requires *legislative* decision-making through passage of an ordinance. The Council's decision acts as a check on the regulatory program, in much the same way that legislatures' appropriations decisions can check agencies' regulatory programs. Thus, we consider the Council to have acted in a predominantly legislative capacity for purposes of the first factor.

This factor suggested that the charge was a tax in *Valero*, where it was imposed upon persons disposing waste at landfills, who in turn passed the cost on to their customers, thereby spreading it "to a significantly wider portion of the population." *Id.*; accord *DIRECTV*, 513 F.3d at 125–26. In *GenOn*, however, we concluded that a carbon emission charge was a fee rather than a tax primarily because the charge applied to only one entity. 650 F.3d at 1024.[4]

Here, the second factor is largely inconclusive. On the one hand, the stormwater management charge applies to a broad class of property owners, suggesting that it is a tax. But on the other hand, it isn't assessed *solely* on the basis of property ownership. Rather, the amount assessed is proportional to the amount of impervious surface on an owner's property. And property owners may receive credits against the assessment if they engage in certain stormwater management practices. These features suggest that the charge is a measure of the stormwater management obligations that each parcel imposes upon the City, rather than a measure of ability to pay. And this makes the charge more like a fee. These features also distinguish the stormwater management charge from the charge in *Valero*, which applied to all waste disposers regardless of their contribution to

---

[4] Courts have differed as to how the second factor applies to stormwater management charges. *Compare DeKalb County v. United States*, 108 Fed. Cl. 681, 700–01 (2013) (concluding that the second factor suggested a stormwater management charge was a tax), *and McLeod v. Columbia County*, 254 F. Supp. 2d 1340, 1346 (S.D. Ga. 2003) (same), *with Homewood Vill., LLC v. Unified Gov't of Athens-Clarke County*, 132 F. Supp. 3d 1376, 1381 (M.D. Ga. 2015) (reaching the opposite conclusion).

9

the burden that the charge was designed to address—closing underfunded landfills. On balance then, this second factor is effectively a wash as to the nature of the charge.

## C.

Under the third *San Juan Cellular* factor—which is the most important one in close cases—a charge is more likely to be a tax if its primary purpose is to raise revenue for general government activity that benefits the entire community. 967 F.2d at 685–86. This is true even if the revenue is placed into a special fund and segregated from general revenue, as long as "the special fund is used to benefit the population at large." *Valero*, 205 F.3d at 135. Conversely, a charge is more likely to be a fee if it's used to provide individualized benefits or to defray an agency's costs of regulating. *San Juan Cellular*, 967 F.2d at 685–86. A charge will also be considered a fee if its primary purpose is to regulate conduct by making it more expensive (even if the charge also raises revenue). *S.C. ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir. 1983).

The third factor pointed to the charge being a tax in *Valero*, where the funds collected were used to support the closure of underfunded landfills in an environmentally sound manner that complied with EPA regulations. 205 F.3d at 134–35. The charge's purpose was to protect the state's groundwater, which benefitted the general public. *Id.* And in *United States v. City of Huntington*, the charge's purpose suggested it was a tax where the charge paid for "core government services" including fire and flood protection and street maintenance. 999 F.2d 71, 73 (4th Cir. 1993).

On the other hand, the charge's purpose suggested it was a fee in *San Juan Cellular*, where the funds were used to regulate cell phone providers. 967 F.2d at 686.

10

The court noted that there need not be an exact match between the charge assessed and the agency's expenditures on a particular regulated firm. *Id.* at 686–87. In *GenOn*, we found that a carbon emission charge was "plainly regulatory," just like a classic fee, because it "create[d] disincentives for GenOn to continue polluting and provide[d] funds for others to reduce their carbon dioxide emissions." 650 F.3d at 1025.

Courts have reached different results in applying the third factor to stormwater management charges. In *DeKalb County*, the court concluded that the third factor suggested the charge was a tax because the benefits of stormwater management—flood prevention and abatement of water pollution—were shared broadly by the general public. 108 Fed. Cl. at 701. The court also noted that the assessment of a stormwater charge is based "not on the *benefits* derived by the payor, but by the anticipated *burden* that its property imposes on the stormwater system." *Id.* at 703. And the charge couldn't be considered a voluntary user fee because property owners couldn't decline stormwater services. *Id.* at 704–06. The *McLeod* court reached a similar result, noting that "[s]torm water management was and is the type of service that is often funded through general tax revenue." 254 F. Supp. 2d at 1347–48. The *Homewood Village* court, however, reached the opposite conclusion, noting that although all residents receive a benefit from stormwater management, "those paying the charge receive a special benefit" because the county treats polluted water on their properties, facilitating compliance with state and federal requirements. 132 F. Supp. 3d at 1381 (citing *Homewood Vill., LLC v. Unified Gov't of Athens-Clarke County*, 739 S.E.2d 316, 318 (Ga. 2013)).

11

Norfolk Southern argues that Roanoke's stormwater management charge serves two purposes that both benefit the general public: reducing water pollution and improving flood control. It analogizes these purposes to maintaining the safety of the state's groundwater, which we held to be a public benefit in *Valero*. Defendants respond that they are obligated by law to operate a stormwater management system and to use all revenue generated from the charge for specific stormwater management activities. Thus, although the charge may benefit the public, its primary purpose is to satisfy regulatory requirements.[5] Norfolk Southern's rejoinder is that the charge isn't regulatory in the sense recognized by *San Juan Cellular* because the City is a regulated entity, rather than a regulator. The railroad notes that the stormwater Utility doesn't directly regulate its activity or issue any permit for its stormwater discharges.

We think the charge's purpose is more consistent with that of a fee than a tax, because the charge forms part of a comprehensive regulatory scheme. Although municipalities may have traditionally provided stormwater management as a public benefit at the discretion of their legislatures, the Clean Water Act's regulatory scheme now requires the City to take myriad concrete actions to reduce discharges and pollutant concentrations—many of them relating directly to runoff from Norfolk Southern's

---

[5] Defendants also note that all revenue from the charge is placed into a segregated enterprise fund, rather than the City's general fund. But standing alone, the fact that revenue from the charge is placed in a special fund is "immaterial." *Valero*, 205 F.3d at 135.

12

property and the waters that receive it. *See, e.g.*, J.A. 140–44, 169–80, 262, 284–86, 554–58.

What's more, if the City elects to assess a charge to offset the costs of complying with these regulatory obligations, it must do so consistent with the state authorizing statute, Va. Code Ann. § 15.2-2114. This statute restricts the funds to specific uses related to stormwater management, and it requires that the charge incentivize stormwater management practices by crediting property owners who adopt them. *Id.* § 15.2-2114(D). These requirements have removed much of the legislative discretion that was traditionally associated with stormwater management. The City is now a participant in a comprehensive scheme regulating stormwater management and the assessment of charges to pay for it.

Of course, the City doesn't directly regulate Norfolk Southern or other stormwater dischargers, nor does it issue permits for their discharges. Thus, rather than defraying the City's costs of regulating, the charge primarily defrays the City's costs of complying with regulations imposed upon it. At bottom, however, a classic regulatory fee is designed to address harmful impacts of otherwise permissible activities, and to ensure that the actors responsible for those impacts bear the costs of addressing them. That is exactly the function served by Roanoke's stormwater management charge, which ensures that owners of impervious surfaces bear the cost of managing stormwater runoff.

In sum, the charge is part of a regulatory scheme, rooted in the Clean Water Act, whose purpose is to remedy the environmental harms associated with stormwater runoff and to hold stormwater dischargers responsible for footing the bill. EPA's regulations

13

ensure that the harms of stormwater discharge are addressed, and the City levies a charge (as directed by the state) upon those whose activity creates the need for regulation. The charge also serves the regulatory function of incentivizing property owners to reduce the amount of impervious surface on their land and engage in stormwater management practices that qualify them for credits.

As a result, the third *San Juan Cellular* factor suggests that the charge is a fee.

### D.

Finally, we consider the three *San Juan Cellular* factors collectively, in light of all the relevant circumstances, to decide whether the City's stormwater management charge is a tax subject to the 4-R Act's requirements, or a fee beyond the reach of those requirements. As the district court acknowledged, this is a "close question." *Norfolk S.*, 2017 WL 6599008, at \*8. The first factor suggests that the charge is a tax because it's imposed by the legislature. The second factor is largely inconclusive because the charge is levied upon most properties but based on contributions to stormwater runoff rather than ability to pay. The third factor suggests that the charge is a fee because it forms part of a comprehensive regulatory scheme.

Applying the principle we articulated in *Valero*, 205 F.3d at 134, we give the third factor controlling weight here because the charge's regulatory purpose provides a better indication of its overall nature than the body that implemented it or the class of persons it is levied upon. *See also Club Ass'n of W. Va., Inc. v. Wise*, 293 F.3d 723, 726 (4th Cir. 2002) (applying this principle). Accordingly, we conclude that the charge is a fee, rather

14

than a tax subject to the 4-R Act's requirements. The district court correctly granted Defendants' motion for summary judgment.

*AFFIRMED*

WILKINSON, Circuit Judge, concurring:

I am happy to concur in Judge Diaz's fine opinion. For the reasons given in that opinion, I agree that the charge levied on Norfolk Southern by the City of Roanoke is a fee and not a tax. I write separately to describe how this case fits into the larger story of environmental restoration.

I.

Captain John Smith's party could hardly convey to readers the "abundance of fish lying so thicke" that exceeded any river in Europe: "Neither better fish, more plenty, or variety, had any of us ever seene, in any place swimming in the water, then in the Bay of Chesapeack …." Walter Russell & Anas Todkill et al., *The Accidents That Happened in the Discoverie of the Bay*, *in* 1 *The Complete Works of Captain John Smith (1580-1631)* 224, 228 (Philip L. Barbour ed., 1986). Before the arrival of Captain Smith, the Algonquin Indians recognized the extraordinary productivity of the Bay, terming it "Chesepioc," meaning "great shellfish bay." Christopher P. White, *The Chesapeake Bay Field Guide*, 3 (1989). More than a century later, in 1728, William Byrd II wrote that "one might believe, when he sees such terrible amounts of them, that there was as great a supply of herring as there is water. In a word, it is unbelievable, indeed, indescribable, and also incomprehensible, what quantity is found there. One must behold oneself." William Byrd, *The Newly Discovered Eden* 78 (Richmond C. Beatty & William J. Mulloy eds., trans., 1940).

Today, one no longer can. Instead of fish, we quantify phosphorus, nitrogen, sediment, and other pollutants. Clouds of sediment and algal blooms blot out the sun,

16

leaving the subaqueous flora starved for photosynthetic fuel. U.S. Environmental Protection Agency, *Chesapeake Bay: Introduction to an Ecosystem*, 4 (Kathryn Reshetiloff ed., 1995). As the underwater grasses die for lack of sun, the fauna that rely on them begin to die as well. *Id.* Microscopic zooplankton and small invertebrates that feed on the grasses are deprived of their food. Alice Jane Lippson and Robert L. Lippson, *Life in the Chesapeake Bay*, 175, 192 (2006). In turn, species of fish and fowl that feed on these creatures lose their food as well. *Id.* Blue crabs lose a safe place to hide after they shed their hard shells during their seasonal molting. Christopher P. White, *Chesapeake Bay: A Field Guide*, 84 (1989). And fish like menhaden and croakers, which use the grasses as protective nurseries, are deprived of a safe place to nurture their young. Alice Jane Lippson and Robert L. Lippson, *Life in the Chesapeake Bay*, 190 (2006). Those fish that remain suffer from contamination by metals like chromium and mercury or organic contaminants like PCBs and pesticides. Karl Blankenship, "Report finds evidence of toxic contaminants impacting fish," Bay Journal (January 1, 2013).

But all that has happened, and is happening, need not always happen. And therein lies the future of Virginia's waters and the Bay.

II.

Restoring damaged waters like the Chesapeake Bay requires sustained effort, entailing cooperation and coordination among the federal government, "[s]tate and local governments, the enterprise of the private sector, and . . . all the people who make this region their home." Exec. Order No. 13508, 74 Fed. Reg. 23099, 23100 (May 12, 2009). Chesapeake Bay restoration would be impossible without stitching together the efforts of

17

a vast number of people from diverse walks of life: cattle farmers in West Virginia, lawn care specialists in New York, and golf course operators in Pennsylvania, to name a few, not to mention countless public servants—town managers, environmental experts, Cooperative Extension agents. All share a common goal and corresponding common burdens.

The response to the problem of stormwater runoff demonstrates the necessity of cooperation between all levels of government and private actors. Stormwater is of particular concern to environmental restoration: when it falls on impervious surfaces like streets or parking lots, it picks up pollutants like motor oil, animal waste, or just plain dirt, and washes them into the local streams. These pollutants contain chemical contaminants and the nutrients that feed algal blooms. They make their way through streams and tributaries, causing harm along the way, until they collect in the estuary where the rivers meet the ocean. William H. Funk, "Virginia Artificial Wetland a Game-Changer for Stormwater Pollution," Chesapeake Bay Magazine (June 13, 2017).

The scheme that regulates stormwater runoff begins with the federal government which, through the Clean Water Act, mandates that states set water quality standards that any given river must meet. 33 U.S.C. § 1313. If the river does not meet the water quality standards, the state government steps in and works with the EPA to put the river on a "pollution diet" or Total Maximum Daily Load (TMDL). *Id.* The TMDL establishes the total amount of each pollutant that is allowed to drain into the river, and slowly reduces that amount to a level consistent with federally mandated water quality standards. *Id.* One of the ways the state then implements the TMDL is by adjusting the permits it gives to

entities within the river's watershed so that the total amount of pollution these entities are allowed to drain into the river is below the overall limit. Local governments must obtain one of these permits to manage the flow of stormwater from their sewer system into local waterways.

The City of Roanoke's stormwater clean-up scheme, which is governed by its permit, is what's at issue here. While not in the Bay's watershed, the Roanoke River is itself worthy of protection, and the City of Roanoke's program is a prime example of the type of stormwater remediation efforts that localities in the Bay's watershed must enact. A ruling for Norfolk Southern here would have deleterious implications for comparable municipal stormwater programs that are within the Bay's watershed like Richmond, Charlottesville, and Lynchburg. Richmond, Va., Code art. V., § 14-336 (2017); Lynchburg, Va., Code art. V., § 16.2-56 (2018); Charlottesville, Va. Code art. VI., § 10-104 (2018). And so while this case does not deal directly with the Chesapeake's waters, its health is very much at stake here.

Under its permit, the City of Roanoke has the burden of reducing stormwater pollution, but it can only do this with the cooperation of its residents. In addition to maintaining its sewer infrastructure, the City coordinates with local "watershed associations, environmental advisory committees, and other environmental organizations." J.A. 156. The City also helps its residents install features like rain gardens and detention ponds that soak up the stormwater rather than allowing it to drain immediately into the river. And, importantly, the City relies on its residents to help fund its stormwater clean-up efforts through the fee at issue here.

19

## III.

In seeking to avoid paying a fee that the City uses to fund its stormwater clean-up scheme, Norfolk Southern, one of the largest property owners in Roanoke, is seeking to absolve itself of responsibility. Stormwater runs off the railroad's property into the City's sewer system. The City must then treat and manage this water to comply with its permit. This costs money. If the City could not charge a fee to Norfolk Southern, Roanoke would bear the burden of managing the railroad's runoff alone. Erroneously deeming this fee a tax under the Railroad Revitalization and Regulatory Reform Act would, as the railroad knows, run the decided risk of limiting its contribution to the broader project of stormwater management. The City would thus lose important revenue needed to offset the costs of building and maintaining municipal gutters and drains, monitoring pollution levels, policing illegal discharges of polluted water, and educating the public on proper environmental practices. Norfolk Southern would, in effect, be shifting its burden to the City. What we have here is the irony of a railroad seeking a free ride.

This is unacceptable. As Judge Diaz aptly notes, "the charge is part of a regulatory scheme, rooted in the Clean Water Act, whose purpose is to remedy the environmental harms associated with stormwater runoff and to hold stormwater dischargers responsible for footing the bill." Maj. Op. at 13. The arteries of the Chesapeake Bay wend through six states, including three in the Fourth Circuit (Maryland, West Virginia, and Virginia). Numerous localities in the Bay's watershed have clean-up schemes with fees comparable to Roanoke's. Norfolk Southern's position would put these projects at risk.

20

Our rivers and estuaries are complex, interconnected ecosystems. It follows, therefore, that efforts to restore them are correspondingly complex and interconnected. Without the cooperation of all levels of government, as well as of private companies and citizens, our waters will continue to be compromised by pollution. The restoration effort imposes burdens on many people; happily, the benefits of clean waters (economic; health; scenic; recreational) accrue to just as many if not more. Everyone, including the owners and employees of Norfolk Southern, are better off when our streams run clear and estuarine flora and fauna are flourishing. It is only fair to ask those who benefit to shoulder some of the burden.

No one is so naïve as to believe that the Chesapeake Bay can be restored to the pristine condition viewed by John Smith and William Byrd, or that the Roanoke River and its tributaries such as Peters Creek and Tinker Creek can be restored to the condition in which this country's earliest inhabitants found them. We would be fortunate to preserve a wholesome fraction of what once there was. This case is but a tiny chapter in the story of our nation's effort to reconcile the just demands of development with the imperative of preserving an environment that can help make productive enterprise worth having. A reversal here might seem just a small setback. But a series of such setbacks accelerates rather than retards the degradation of the natural world. We happily accepted the abundance that came down from our forebears. How then can we impoverish the environment for those who come after?

WYNN, Circuit Judge, concurring:

I concur in the majority opinion's determination that the City of Roanoke's stormwater assessment constitutes a "fee," rather than a "tax," and therefore is not subject to the provision in the Railroad Revitalization and Reform Act (the "4-R Act") prohibiting state and municipal "tax[es]" that discriminate against rail carriers. 49 U.S.C. § 11501(b)(4). The assessment is connected to a federal regulatory program, is designed to defray the costs of that program, and encourages property owners to take steps to advance the program's regulatory objectives, and therefore serves "primarily . . . regulatory or punitive purposes, making it a 'fee.'" *GenOn Mid-Atlantic, LLC v. Montgomery Cty., Md.*, 650 F.3d 1021, 1023 (4th Cir. 2011) (internal quotation marks omitted).

The analytical framework used in this matter derives from the First Circuit's decision in *San Juan Cellular Telephone Co. v. Public Svc. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.). The framework in that case has been used to distinguish "taxes" from "fees" for purposes of the Tax Injunction Act, 28 U.S.C. § 1341. *See Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000).

Here, we apply that Tax Injunction Act precedent to interpret whether an assessment is a "tax" or "fee" under the 4-R Act. In doing so, we recognize that this Court has held that "we must examine the explicit factual circumstances that transcend the literal meaning of the terminology and ask whether the charge is levied primarily for revenue raising purposes, making it a 'tax,' or whether it is assessed primary for regulatory or punitive purposes, making it a 'fee.'" *GenOn*, 650 F.3d at 1023 (internal

22

quotation marks omitted). "[B]roader-based taxes . . . sustain the essential flow of revenue to the state (or local) government [whereas] fees . . . are connected to some regulatory scheme." *Collins Holding Corp. v. Jasper Cty., S.C.*, 123 F.3d 797, 800 (4th Cir. 1997). And this Court's long-standing precedent makes clear that "[t]he proper analysis to arrive at the real nature of the assessment is to examine all the facts and circumstances and assess them on the basis of economic realities." *United States v. City of Huntington, W. Va.*, 999 F.2d 71, 73 (4th Cir. 1993) (internal quotation marks and alterations omitted).

Thus, determining whether an assessment amounts to a tax or fee turns on "all the facts and circumstances." *Id.* Nonetheless, this Court, and other courts, have characterized *San Juan Cellular* as identifying three "factors" that bear on the resolution of that question: "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." *Valero*, 205 F.3d at 134. But *San Juan Cellular* did not enumerate a "three-factor" test—which instead came from a Ninth Circuit opinion purporting to distill the analysis in *San Juan Cellular*. *See Bidart Bros. v. Cal. Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996). Rather, *San Juan Cellular* highlighted three "facts of th[e] case"—which "facts" the Ninth Circuit later denominated as "factors"—because those facts indicated that the assessment at issue was "close to the 'fee' end of the spectrum," "with a paradigmatic tax at one end and a paradigmatic fee at the other." 967 F.2d at 686. The court had no reason to address other "circumstances" that might be relevant in distinguishing a tax from a fee because they were not present in the case. *Id.*

23

Significantly, our Tax Injunction Act decisions distinguishing between taxes and fees have not always rigorously adhered to the three-factor analytical framework. *See, e.g.*, *GenOn*, 650 F.3d at 1023–24 (placing little weight on first factor, and characterizing three factor framework as an "aid" in resolving governing question of whether assessment is for revenue raising purposes or regulatory purposes); *Collins*, 123 F.3d at 797 (citing *San Juan Cellular*, but only addressing two of the three factors, and characterizing the third factor—the "purpose and ultimate use of the assessment"—as "the heart of the inquiry").

I write separately to point out that reducing a "totality-of-the-circumstances" inquiry into a "three-factor test" poses substantial risks. It elevates the significance of enumerated factors, relative to non-enumerated factors. It suggests that the enumerated factors warrant equal significance in the ultimate weighing, notwithstanding that some facts may be more important than others. It also discourages courts from considering factors that are not enumerated in the test, but may be highly relevant in a particular case. And it serves as an invitation to lower courts to simply tick through the enumerated factors and determine whether more factors favor treating an assessment as a tax or a fee. But "a score of [2] to [1] decides a baseball game," *Remington Hybrid Seed Co.*, 495 F.3d 403, 407 (7th Cir. 2007), not a multi-factorial balancing test, let alone a totality-of-the-facts-and-circumstances test, like that used to determine whether an assessment constitutes a tax or fee, *cf. Hexom v. Or. Dep't of Transp.*, 177 F.3d 1134, 1137 (9th Cir. 1999) (explaining that cases applying the *San Juan Cellular* test "take a practical and

24

sensible approach. They do not apply a set of rigid rules or elements and then reach a mechanical conclusion").

In this case, we conclude that the first two factors have little or no bearing on our ultimate determination that the assessment at issue constitutes a fee. Additionally, the decisive third factor—which appears to be coextensive with the purpose of the entire three-factor inquiry—encompasses numerous considerations that bear significant weight in the ultimate determination—such as whether the funds are kept in a segregated fund and whether the assessment incentivizes decisions that advance the program's regulatory objectives—but which are not elevated to separate "factors" in the three-factor framework. Thus, though we characterize our analytical framework as a "three factor test," the analysis adheres moreso to the governing "totality-of-the-circumstances" inquiry.

In sum, the three "factors" from *San Juan Cellular* provide helpful guidance in analyzing the fundamental question of whether an assessment serves revenue raising purposes, and therefore is a tax, or serves a regulatory purpose, and therefore is a fee. But the "heart of the inquiry" remains "the purpose and ultimate use of the assessment." *Collins*, 123 F.3d at 797. The majority opinion engages in a thorough and persuasive analysis of numerous facts and circumstances bearing on that question and concludes the assessment is a fee. Accordingly, I concur.

25